Good morning, Your Honor. Matthew Rabban for Plaintiff, Realordo Appling. Okay, you're going to have to keep your voice—stand in front of that microphone. Speak up, so we need to be able to hear you. Yes, Your Honor. Matthew Rabban for Realordo Appling, Plaintiff. May I reserve a few minutes for rebuttal? You just dropped your voice. It's really hard to hear you, Counselor. Okay. Keep it up. Speak loudly. Yes. Okay, Your Honor. This case here is really— Hold on. I've got this device. I've got that. Okay. I'm wired. Yes, Your Honor. But I'm not, and I can't hear you, so—okay. This case here is, you know, just a quick background fact. It is really quite a disaster. What really happened was this young man, he was put in jail for 300 days wrongfully. The real criminal, they never caught him. They had to tell the victims to go hire a private detective. And the reason why he was really falsely imprisoned was because there were numerous constitutional violations that were violated in his case. Just to start off, some quick facts. Basically, what happened was there was a fight in a parking lot outside of a disco in Hollywood. They find the passenger, who was a female, and what they tell her is— just tell me who you know that's black. You forgot to tell us that almost a year had gone by. One year, yeah. Over one year had gone by. Oh, there's other facts, too. One year had gone by. The witnesses apparently spent over $1,500 on alcohol that night. They couldn't draw a sketch just the very next day. This is a whole year later. Okay, but what about the problem that there's one security guard that did identify Mr. Appling, right? Who hadn't consumed $1,500 worth of alcohol. So you've got to deal with that. There's one security—that goes to the lineup. There's several issues on the lineup, okay? First off— Can I tell you right now what my two questions are? Yes. That's going to be one of them. Okay. There was that in terms of supporting probable cause, and then I'm going to get out of your way. The other is that there's this—and I've gone over and over this record. There's a complaint for arrest—it's called Felony Complaint for Arrest Warrant, ER-25, okay? And on the last page of that, which is ER-28, this is what was given to the judicial officer to authorize the arrest warrant. It says about two-thirds of the way down, it says, and incorporated herein are official reports and documents of law enforcement agency and so on and so forth. I can't tell what was attached to that. Okay. I can't tell whether, in particular, whether the police officer's summary was attached to that. So those are my two questions. Okay. To answer—to go to the first question regarding the lineup, okay? So there's numerous issues with this lineup, okay? The first issue is that that one person who did pick him, that's one out of eight. The only person who actually pointed to him directly is one out of eight, but that same witness was wrong on the other, on the passenger. So that's one. So did the judicial officer know that? What was attached to the complaint for the arrest warrant? The arrest warrant, which she testified to— Well, she didn't know. She gave this to the DA. She didn't present this to the judicial officer. It's the DA that did. That's right. That's right. She went to the DA. She went to the district attorney with a summary, which basically sold the apple like the orange. She compiled a witness book, or she compiled a book of all that she had done and gave it to the DA. She said she compiled the whole book, but what she said is she put everything in a summary. Did she call it a murder book? The murder book was given to the DA months later. I'm trying to figure out whether or not her summary, which has, in particular, ER 52, says that the car was determined to be driven by Mr. Appling. That's exactly what was not determined. They did not know that he drove that car. But I want to know if this summary went to the judicial officer who authorized the arrest warrant. They presented it to the judge to get an arrest warrant. They presented an indictment and used the language in the indictment to substitute for an affidavit. Then they told the judge that they've also left in his chambers their whole pile of evidence that they accumulated. Then he's supposed to go and look through all of it and decide whether there's probable cause. What happened, apparently, in this situation was that the district attorney presented the – I'm sorry, the detective presented the district attorney with the very one-sided summary, and the district attorney just filed the charge. They filed the charge, and they went in and arrested him. Well, they have to – I don't mean to say I know exactly what happened in this case, but I do know that when I was a state court judge, as a municipal court judge, I just – we just didn't sign – I was, too. We just didn't sign arrest warrants without there being a declaration attached to demonstrate probable cause to sign the arrest warrant. The plaintiff's position is that – And it's kind of strange here. I mean, it's the – I mean, I don't know why the city, when they filed their opposition, didn't put together the packet that was presented to the judge so we would all know what the judge had. You know, what I think happened here is that they really just sold him as the criminal, and that had a lot of very negative consequences because, like we pointed out – Absolutely, but that's why we need to know what the judge saw. From my understanding, there was – from my understanding, the district attorney filed the charges, and they went ahead and arrested him. That's my understanding of the facts. There were depositions taken in this case. Yes. Was there ever a deposition that established what the DA's office gave to the judge? Yes. She admitted in testimony that she gave everything, but what she did is give that summary and asked her, did you give a summary? To the DA or to the judge? The detective gave it to the DA. Did you take the deposition of the DA who presented the complaint to the judge? No. So we don't know what she did. On that point, I suppose not. But to your other question about the one person who did identify him, like I said, Hamlin was wrong on another witness, but there were so many witnesses that didn't pick him, who said he wasn't there, and they were completely left out of the summary. Well, and that's why I want to know if the judge knew that the witnesses were all over the map and that several of the witnesses didn't pick Mr. Appling. I understand the witnesses were. There was certainly reason if you looked at all of these witness identifications or non-identifications, there was reason to doubt. But I don't know if the judge was told that. I don't know the answer to that. Does it make a difference? I don't think it does here. Why not? Because, essentially, after a few of the lineups, the detective, she made her own determination that there's enough probable cause, and she admitted in the deposition to me that after a few of the identifications, which were all over the place, she switched to only prosecuting him. She didn't switch to being neutral, and she testified to that. She admitted that in the deposition. At summary judgment, did the district court know that? I presented everything to the . . . Yeah, I believe the district court did know that, yes. I guess your argument would be that at summary judgment, there was at least a question of material fact. I'm going to give opposing counsel an opportunity to respond, of course. But I think your position would be that at least at summary judgment, there would have been a question of material fact about whether the summary, for example, went to the judge who authorized the warrant. Yes, I would agree that would be one of the triable issues of fact. Do you have the summary of the facts that the DA presented to the judge? Yes. That's on the record. On the record. Yes. I thought that's exactly what we didn't have. Oh, yeah. It starts at 52, and it goes to . . . But we don't . . . But Fragerson was asking what was given to the judge by the DA, and I asked that, and you said you don't know. Oh, that's true. Okay, right. That's true. What you know is what the officer gave to the DA. What you haven't nailed down is what the DA actually gave to the judge when the judge signed the arrest warrant. I assume there was an arrest warrant here, wasn't there? I think it was just a formal filing of charges. Just a complaint? I believe so. I guess you can do that nowadays. I mean, I don't know. I have no idea. So, in fact . . . That's not the way we did it back in the day when I was here. We're starting to date ourselves. Watch it. That's why it became a disaster. But what happened . . . Did you do it that way? No. Here's the probable cause finding. To answer your question about the lineup, one of the problems from the outset is that they're using this procedure that is already outlawed, the double-blind procedure. The lineup is gone, isn't it? Excuse me? We're not worried about the lineup, are you? Judge Christin asked about the one witness who picked him from the lineup, and I just want to say about that lineup is that it was a very flawed lineup. I have the original here, if you care. He does look more bright. It was done with a procedure . . . I got all of those pictures here. Okay. I'm going to frame them. Another very important issue is that they're not using a blind procedure, which means the person who's administering the six-pack, he knows which person it is. And according to my doctor that we hired in the case, the forensic psychologist, this is a very flawed procedure. It is very dangerous, and it is the reason why we have a lot of wrongful convictions right now for a procedure like this. And there's no court cases on that matter, on that issue, with the unblind procedure. Okay. So let me . . . I just want to . . . Your time is running out, and I just want to . . . So one of your claims is lack of probable cause for the arrest warrant, or for the charges, correct? Right. And then you also have, I believe it's a malicious prosecution theory? There are several theories, yes. Do you care to address any of those other theories? You know, the main . . . There are theories that are much more important. As a whole, this was a very large due process violation. Okay. The case of Devereaux . . . Well, that gets to a different theory. Okay, okay. The two that you asked me about, you know . . . Let me ask you this. What do you believe is your strongest claim here? Strongest? Let me put it that way. Lack of probable cause for the charges? I would say lack of probable cause. And one very large mistake that they did, or just strategy, was that they repeatedly told witnesses that we got the guy. So many of the witnesses, what first said, he's not in the lineup. They came to the trial. They all pointed straight at him. He was done. He was done. That's part of your probable cause theory? It's more of a fabrication theory. It's a . . . A Devereaux theory. Exactly. It's a . . . A fabricated evidence. Fabrication of evidence. Exactly. That's the tainting of the witness recollection when you keep telling witnesses that we got the guy. We got the guy. He's toast. There's no way that someone can win a trial after all the witnesses point to him and say, oh, he punched a woman. In the beginning, they said, he's not in the lineup. But in the trial, they come and say, yeah, that's him. He punched a woman. He ran over the person. So that just shows how they change the identifications. When for most of them saying it wasn't him, and then the trial, it was him. Okay. And that was caused . . . A big part of why that was caused was by the . . . There was no probable cause because . . . Look, we have here that felony complaint for an arrest warrant. So you have a warrant and a complaint all as one document. Yeah, that's right. And I don't see where a probable cause for an arrest is really specifically covered. In this . . . It's appearing right here. Well, it appears . . . Sufficient cause. So, counsel, we're looking at ER 28 and an ER . . . He says sufficient cause, but we don't know what the judge was looking at. And 31. He just got the complaint. And somehow there's some general statements here, and he concludes that there's sufficient cause. But no details. That's the way they do it these days. You know, apparently, Your Honor . . . I mean, I don't know the exact answer to that, but this was apparently how it was done. Well, we can ask that. Yes. Okay. Why don't you . . . We hear from the other side. Okay. Thank you. Good morning, Your Honors. Deputy City Attorney Wendy Shapiro on behalf of the Appellee City of Los Angeles LAPD detectives Sue Bransdetter, Timo Illig, and Thomas Small. I may be disappointing you because I don't know what was presented to the judge. This is the day of me saying, what are we missing from the record? Well, but here's the thing. Okay. Detective Bransdetter did her job. She did it well. She put together the case. She gave all of the documents over to the district attorney to file the case. And the district attorney said, you know what? I really want you to focus a little bit more on the security guard, Hamlin. Can you conduct another investigation or another interview? Which she did. And then she brought a summary of the interview back to the district attorney. And within a few days, criminal charges were filed. Detective Bransdetter did her job. Well, Detective Bransdetter, I think, authored this summary that I find very concerning. And it says that Mr. Appling was determined to be the driver of the car, counsel. And that is exactly what they didn't know. And my response to that is, this is not an LAPD document. This is a district attorney charge evaluation sheet. So that's why I'm trying to figure out what was given since you're defending the claims. The murder book. The murder book. So the murder book contained the chronology. The question was what was given to the judge. I don't know what was given to the judge. What was given over was given to the district attorney who then filed the criminal charges. And I think the record, I've got a chronology here. I don't want to take all your time. But I think the murder book was given. I'm not suggesting that Detective Bransdetter didn't give it over. I think it was given over some months later. She's pretty clear about that. After the charges were filed. Pretty clear about that in her deposition testimony. So, again, I'm not about pointing fingers. I'm just trying to figure out whether there was probable cause, whether there was judicial deception, and I can't tell what was given. My understanding is that Detective Bransdetter gave her murder book over to the district attorney in time for her to review it and to file the criminal charges. And we know for certain, at least with respect to Hamlin, there was an additional investigation. Detective Bransdetter's declaration states that she provided all of the lineup photographic identifications, which included some of the people who did not ID, and that the district attorney was aware of that. Was the judge aware of that? I don't know. Why isn't there a factual dispute, then, over what the judge knew, given what the claims are here? Because the record put forward in the summary judgment demonstrated that there was an arrest warrant. Obviously, the arrest warrant issued after the district attorney brought evidence to the judge, so the judge felt there was sufficient evidence for an arrest warrant. And not only that, there was a preliminary hearing. I mean, they tried to demonstrate why there was a lack of probable cause. You could easily rebut that if we knew exactly what had been presented to the judge. But we know that the criminal charges were filed by the district attorney after which the arrest warrant issued, and that's in supplemental excerpts. Why does that help us? Because he wasn't arrested until after the arrest warrant issued. The counsel. We have to know what was given to the judge. So you're familiar with our authority, the Alma case, Amada case? So if documentations were given to the judicial officer that are misleading, and there's at least one case summary that on its surface seems to be very misleading, then we have to look at what the judge saw, take that offending record out of the evidence, and see whether there was probable cause remaining. And that's what I'm very challenged to do here. I guess I'm confused because the detective Branstetter's declaration stated that she provided the murder book to the district attorney before criminal charges were filed. Do you know what paragraph she says that? Branstetter declaration, is that the one you're talking about? Yeah. It's a very long, it's like 70-some-odd paragraphs. Do you know which one? She says on paragraph 72 she says, on July 13th I provided Deputy District Attorney Axelson a summary of the interview with Hamlin. But that's the time when the murder book is presented. Actually the murder book. Does she say that? She says on May 17th the case was presented to the Los Angeles County District Attorney. And then she's asked, that's the murder book, and then she's asked to conduct an additional interview when the interview. But where does she say it was that she gave him the murder book? Where does she say murder book I gave to the district attorney? Maybe it's in here. It's paragraph 84. I created a multi-volume. 84. Hold on. During the murder, let's see, the entire murder book was handed over to the DA's office during the course of the prosecution. So you're telling me what she really meant there is that she gave it to him before it was filed. Correct. And then. You don't usually think of a prosecution beginning before it was filed. It could have been written more precisely. But the next sentence, on January 21st, 2011, everything in my possession relating to the investigation was turned over to Deputy District Attorney Ashley Rosen. Mr. Appling. When was the complaint filed? The probable cause finding is dated August 2nd, 2010. And he's not arrested until, okay, but he's still not arrested until afterwards. Based on a probable cause finding that's some months earlier. I'm not trying to be accusatory. I'm trying to figure out the record, and I'm just trying to connect the dots. The case summary was presented May 24. The probable cause finding comes August 2nd. According to the supplemental excerpts of record at page 65, it appears that the first is January 31st, 2011. Case was filed on 8-2, but then arrest warrant issue as of January 31st, 2011. So it may have been initially filed, and then later, months later, the arrest warrant issued in January of 2011. The probable cause finding is August 2nd. Okay, but the arrest warrant still issues in January of 2011. What's your point? I don't understand your point. Meaning that it was. You don't issue an arrest warrant without probable cause, and the probable cause was found back in August. Okay, so if it was found back in August, but the arrest warrant didn't issue, it had to issue through a judicial review, so that would have determined the probable cause. Do you think that we should assume that probable cause was revisited? Yes. Why? At a minimum. Because the arrest warrant wouldn't issue without. A probable cause finding that happened in August. I don't know why I would make that assumption. Well, he certainly isn't arrested until after January of 2011. So they couldn't find him right away. But at that point, all of the evidence was handed back to, I mean, we know from Randstetter's declaration by January. We're not connecting, because we're concerned about what evidence was before the judicial officer, when the judicial officer issued sufficient cause finding or probable cause finding, which was before he's arrested. Well, let me just say we have – then let me just say this. Probable cause would be established with just the identification of Hamlin. You can have probable cause based on one witness identification, and there was nothing in the record from him to say that he was pressured. Do you think it might make a difference to a reasonable bench officer in the L.A. Superior Court that if he had known that other people had not identified him? I think it would. It might make a difference? It might make a difference. It would, but here's the thing. We had, again, the arrest warrant did issue, so the judge had some material at that point. There was also a preliminary hearing at which all of the witnesses testified, and he was held to answer. What's the date of the preliminary hearing? That's helpful. I don't think I have that date. It's in the supplemental excerpts of record. Okay.  so that would be helpful for me to have. Okay. At page 66, there's a preliminary hearing. None of the detectives testify at that, so there's no way to argue they lied at the preliminary hearing. I'm not suggesting anybody lied. What's the date, please? Of 2011? Okay. So our authority, again, it's the Almada case, or that's one of many, would say that if there's some piece of evidence, like that case summary that went, even by mistake, just a good-faith mistake to the judicial officer, we need to extract it and look at what else the judicial officer had to see whether there was probable cause. And that gets to Judge Pius' other question, which is you've got, I think, one security officer who, pretty unequivocally, pointed incorrectly, apparently, to Mr. Appling. And so we would need to know, did that judicial officer know that all of the, or many of the other witnesses didn't identify Mr. Appling? And that's what we're struggling with. Well, so I can answer that question. However, in the supplemental excerpts of record in the preliminary hearing, it lists all of the witnesses who testified. In there, includes all of the witnesses, even those who kind of were ambivalent. Did they testify at, did those witnesses testify at the preliminary hearing? Yes. So we have Michael Weaver, Danielle Weaver, Amanda Moore, and Tommy Clayton. Moore and Clayton were the two witnesses who picked two different. Do we know what they testified to at the preliminary? I don't have that in the record. Did they testify at the preliminary hearing? I don't have that. That's not in the record. What was the date of the preliminary hearing? Pardon me? When did the preliminary hearing take place? January 31, 2011. So, counsel, then it gets to what, I just want to give you an opportunity since you don't get to come back up. Because opposing counsel is going to say, when those folks testified at the preliminary hearing, some of them had Googled Mr. Appling. Some of them had been told by the prosecutor we got our guy. That's his Devereux claim. Do you want a chance to respond to that? Well, a couple of things. One, his name became public record once the criminal charges were filed. And on their own, they decided to Google him. There's no connection between anything that the detectives did and their independent decision to Google him. There's nothing in the record that shows that they said, hey, why don't you Google him? Why don't you get a refresher? There's nothing about that. So your position is, if that happened, it's not your client's fault? Exactly. There's nothing connecting them. But again, I would say there is probable cause, even if there's an ambiguity in the record about what the judge, there's probable cause based on what the security guard, Hamlin, identified him. The fact that he may have later on got charges dismissed. He may have identified him a year later, 11 months later. And that can happen. Let me ask you, they were out there investigating at night, right? The night of the incident? Or the day later, yeah. Did they interview Hamlin that day? I believe it was the next day. They interviewed Murray and Hamlin. Did they interview him the next day when they were out there? I believe they did. Within a couple of days, they interviewed him. Did they give any kind of description of the person? Well, what happened is, Murray, the other security guard who was injured, recognized Jennifer Williams as a regular of the club. Then they sent him over to the club opera manager, Fujimoto, who said, I think she worked at Hooters. Went over to Hooters. Hooters gave the name Jennifer Williams. Four different witnesses identified. Hamlin on that day, or around that time, did not give any kind of description of the person in the white BMW? Not that I can recall right now. Well, the felony complaint and arrest that the judge signed was July 30, 2010. And here it showed that that document was filed August 2, 2010. But what was the date of the preliminary hearing? January 31. January 31, 2011. But what I think- So that was held after, you know, six months after the judge signed that document. He signed. And he was held to answer. Yeah, this was July 30, 2010. The preliminary hearing was July 31, 2011, a year later. And there's another piece of evidence in the supplemental excerpts of record. There was also a 995 motion to dismiss the indictment, which was denied. And that's another type of judicial determination of probable cause. And at that point, all the witnesses were available and the records could have been challenged. So it's the city's position that there was probable cause based on security guard Hamlin's identification. All of the evidence was handed over to the district attorney who then made the decision, there's enough not only to charge, but we think we can obtain a conviction. The district attorney handed it over to a judge. Detective Branstetter and Illig and Small have no control over that at that point. They've given all of their materials. Doesn't that relate to what damages he could recover just on a lack of probable cause? Certainly, if he's arrested and convicted without and held without probable cause, it certainly goes to his... Oh, I see you're talking about the Smitty presumption. Yes. If it's handed over to the prosecutor without being able to rebut the presumption, damages are cut off. That's correct. But he also has a malicious prosecution claim. But that's negated by probable cause, and it's also... Then you have to get to the exceptions to that. Well, we don't think there are any exceptions to the probable cause, but there's also not a favorable termination as that's determined under state law because the charges were dismissed pursuant to 1382, which is more of a procedural dismissal and not a dismissal on the merits. Is there a case that specifically says that? Yeah, it's a WAPD. For purposes of malicious prosecution, a dismissal under 1382... Nothing that specific. What happens is... ...is not a favorable termination. Not specific to 1382, but federal court looks to state law, and under state law, a case of Jaffe v. Stone sets forth the proposition that the dismissal can't be on procedural grounds. It has to indicate innocence. Why is it procedural grounds? They made a substantive determination not to go forward. We don't have enough evidence. But the 1382 charges were based because it wasn't brought on time, so that's procedural. And also the court, and this is in the record, said, don't dismiss, let me dismiss myself because in the event you find new evidence, you can refile. That's definitely not an indication that they believe, that the court believed that this was an innocence. Can I ask? I think it's correct, but I want you to correct me if I'm wrong, that the city stipulated, at the end of the day, stipulated that the BMW couldn't have been the right BMW because of the broken window, but still opposed the motion for a new trial. Is that right? So it's the district attorney, and I represent the city of Los Angeles. Am I right about the record? I believe they stipulated. I don't know that they opposed the new trial. I don't know. I haven't focused on that because it's not my client. Let me ask you a question. You talked about Smitty. That was that murder matter that happened down, I think it was Venice. Am I right? Yeah, I don't remember. So what is the Smitty rule? The Smitty rule is a rebuttable presumption that a prosecutor acts independently, and when a prosecutor exercises their independent judgment, damages are cut off at the point of time when the prosecutor determines to file criminal charges. It's a rebuttable presumption, but the burden is to show that the prosecutor was misled by false information. That was my case many years ago. I was a trial judge and got reversed by the circuit in part, but it was a terrible court of appeals mistake. You ought to read it. Have you ever read it? I have a lot because I've done police litigation for years, so yes. It's a friend of the police. Everything that was done there was bungled by the prosecution. They brought on coroners from different offices. San Bernardino, one from L.A. Maybe it was Dr. Noguchi they had then. They couldn't agree. They were days off, hours off. You had lie detector polygraph experts. You had the president of the National Polygraph Association, and his colleagues testified that that president who filed a report that the president of a nationwide association was incompetent. This went on. It's an interesting reading. I never did find. That was Nuckets and Varney, two of L.A.'s top detectives. Names like Nuckles and Varney, you've got a team. They were good detectives, too. One thing about the 11 months incarceration. Mr. Appling was released on bail, and Mr. Appling's bail was revoked when he failed to appear in court during the criminal trial. Bail was reset. At a higher rate, he didn't make his bail. So I just want to make clear that Detective Branstad or the detectives really shouldn't be completely linked with the 11 months of incarceration because of that. That's another issue that would probably go to damages. Okay. Thank you, Your Honor. Fair point. Thank you. Nothing we have to worry about. You get one minute. I'll be quick. She said that Detective Branstad did a great job, but it's not true. Speak to us. Don't speak to her. Waste of your time. She lied, actually, many times. On the favorable determination claim, in the case there's an exception when there's reckless disregard, and that is what happened with those summaries. It was very reckless to keep stating that it was determined that it was him when all the evidence suggested that it wasn't. The issue was raised as to the Googling of him and what happened. It's in the excerpt number 135 to 137. The detectives called some witnesses before the preliminary hearing, mainly Danielle Weaver, and pretty much told the witness that we got the guy, and then she admitted, it's on the record, that then she went and Googled him before the preliminary hearing, and it was very reckless for her to do that. The witnesses were all friends. Of course they're going to share the information, and that goes to the Devereux claim. Thank you. You've used all your time. Thank you. Thank you, Your Honor. The matter is submitted.
judges: Pregerson, Paez, Christen